## Illinois Central Railroad Company v. H. H. Batson, Adm.

1. DEATH FROM NEGLIGENT ACT—*Proof in Action for.*—To entitle a plaintiff to recover, he must show by a preponderance of the evidence that his intestate was in the exercise of ordinary care, at the time of receiving the injury resulting inh is death. He could not have been in the exercise of ordinary care and at the same time guilty of negligence which contributed to the accident. The injury must be attributed to the defendant's negligence and to that alone.

2. NEGLIGENCE—*Defined.*—Negligence is the failure to do what, under all the circumstances of the case, a reasonably prudent person would do for his own welfare and safety.

I. C. R. R. Co. v. Batson.

3. Same—*Failure to Look for Approaching Trains.*—A failure to look on approaching a railroad track to see if a train is approaching, is not in itself, as a matter of law, such negligence as will prevent a recovery, but is a fact to be considered by the jury in passing upon the question of ordinary care.

4. Same—*Duty of Persons Approaching Railroad Tracks.*—It is the duty of a person approaching a place of danger, to do so cautiously and with proper care for his safety. The law requires that he exercise such care as ordinarily prudent and . cautious men observe under similar circumstances. But the degree of care can not be formulated as a rule of conduct, for the conduct of ordinarily cautious and prudent men varies as the circumstances presented are different.

5. Same—*Failure to Look and Listen.*—A failure to look or listen, especially when it appears affirmatively that looking or listening might have enabled the party injured to see the approaching train, and thus avoid injury, is evidence tending to show negligence. But not conclusive evidence, so that a charge of negligence can be predicated upon it as a matter of law.

6. Ordinary Care—*Depends ·Upon the Circumstances of Each Case.*—What is ordinary care depends upon the circumstances of each case, and when the circumstances are such that an ordinarily careful and prudent person would deem it essential to exercise a greater degree of care and caution than upon less threatening circumstances, such greater degree of care is but ordinary care.

7. Same—*Ordinarily a Question of Fact.*—The question of ordinary care is, in the first instance, a question of fact for the jury. If there is a conflict of testimony upon the question and the evidence if considered alone is sufficient to sustain the verdict, the finding of the jury will be conclusive.

8. Same—*When an Instruction to Find for the Defendant is Proper.*—If there is no evidence tending to show care and caution, and no excuse or reason shown for its absence, the allegation in the declaration of due care and caution is not proved, and an instruction to find for defendant is proper.

**Action for Damages.**—Death from negligent act. Trial in the Circuit Court of Jackson County; the Hon. Joseph P. Robarts, Judge, presiding. Verdict and judgment for plaintiff; appeal by defendant. Heard in this court at the August term, 1898. Reversed with a finding of facts. Opinion filed March 10, 1899.

**Statement of the Case.**—The declaration, in the usual form, contains four counts. But as the. third and fourth counts are based upon ordinances, and as these ordinances were not introduced in evidence, these counts need not be considered. The first count charges that the defendant care-

lessly and negligently handled and operated one of its freight trains, and in consequence of such negligence caused and suffered two of the cars attached to said freight train to run over and upon the deceased, who was in the exercise of due care and caution, thereby killing him. The second count charges that it was the duty of defendant while switching trains in the switch yards at Carbondale to cause a flagman to be stationed at the point where Main street and a sidewalk intersect the railroad tracks of defendant; and that it was defendant's duty not to back any freight train over Main street at its crossing of defendant's tracks without having one of its servants upon or by the rear end of its freight train; and that it was the duty of defendant to have on said train a bell and steam whistle and keep one or the other ringing or whistling at least eighty rods from the crossing, so as to give warning of danger. And that while the deceased, with due care and caution, was attempting to cross the tracks at the Main street crossing the defendant carelessly and negligently backed its freight train over the Main street crossing, and, in consequence of such negligence, caused two of the cars attached to the freight train to run over and kill the deceased. The declaration avers that the deceased left him surviving his widow, Susan C. Batson. The Illinois Central Railroad extends north and south through the public square in Carbondale and divides the business portion of the town into two parts, the east side and the west side. Main street runs east and west and crosses the railroad tracks at right angles in the middle of the square. It is the principal thoroughfare of the city, and is about eighty feet wide. Across the square there is a sidewalk on the south side of and adjoining the street—a wooden walk—about eight feet wide. The main switching yard, or tracks of defendant, cross Main street. In the part of the square or park south of Main street there are some trees, but they are trimmed up so as not to obstruct the view of the railroad tracks to one walking on the sidewalk and looking south. The freight depot is at the northwest angle formed by Main street and the tracks. It is west of the

tracks and north of Main street and diagonally opposite the passenger depot. The passenger depot is at the southeast angle formed by the tracks and Main street. It is east of the tracks and south of Main street. Three tracks cross the street, namely, the main track, the house track and the passing track. The main track is on the east side of the switch yard, next to the passenger depot; the house track is on the west side, next to the freight depot, and the passing track is between the house track and the main track. The total width of the tracks, including the spaces between them, is about thirty-one feet. Most of the travel to and from the depots, and between the two sides of the town, is along and over Main street. About 9 o'clock A. M. on the 5th of June, A. D..1895, the regular local freight came in from the north. It left the caboose from 150 to 200 feet on the middle track, north of the street crossing. It then passed by a switch 190 feet south of the crossing to the west or house track, and coming north on that track "kicked" a car across Main street toward the freight depot. Returning to the switch, it passed to the middle track and backed north to hitch to the caboose. At the crossing of the sidewalk, while backing, the rear car struck the deceased, knocking him down, and causing his death. Captain Batson, the deceased, was sixty-three years old, hearty and vigorous for his age, and was police magistrate in Carbondale. He knew the location of Main street and the tracks and their daily use for switching purposes. Shortly after nine o'clock, while on the west side of the public square, he received a check payable at a bank on the east side, and started across the square on the sidewalk on the south side of Main street. When he started he was about 200 feet from the house track, which he directly approached. As he advanced along the sidewalk a boy ran ahead of him and stopped near the house track. Two young men who were ahead of him stopped on the sidewalk between the house track and the middle track, waiting for the cars to pass. The deceased continued to walk toward the tracks. He passed by the boy, then passed on the north side around the two young men

standing on the sidewalk between the house track and the middle track, and stepped on the west rail of the middle track, when he was struck about the shoulder by the rear car of the backing train. There was nothing to obstruct his view of the train. It is in evidence that the conductor of the train was standing on the Main street crossing adjoining the sidewalk crossing, for the purpose of flagging passers by, and that he hallooed at deceased in a loud voice to "look out," and waved his hands. Also, that a man walking behind the deceased called out to warn him of his danger. Immediately after these warnings he was seen to be struck by the car, and to stagger and fall.

After all the evidence had been introduced the defendant, by its counsel, asked the following instruction:

"The court instructs the jury to find for the defendant." Which instruction was refused.

Judgment for the plaintiff on the verdict for $5,000 was rendered, from which this appeal is taken.

WILLIAM H. GREEN, attorney for appellant; JAMES FENTRESS of counsel.

A. S. CALDWELL and R. J. McELVAIN, attorneys for appellee.

MR. JUSTICE WORTHINGTON delivered the opinion of the court.

The vital question in this case is the refusal to give this instruction. If there is evidence to sustain the verdict we find no reversible error in the record. If there is not evidence to sustain the verdict, reluctant as this court is to interfere with the finding of a jury, the judgment can not be affirmed. Two basic propositions are asserted by the declaration and denied by the pleas. First, that the deceased at the time of the accident "was in the exercise of due care and caution for his own safety." Second, that the defendant was guilty of negligence causing the death of the deceased. As wanton negligence is not charged, and as

the doctrine of comparative negligence is not now applied in this State, if the first proposition is not sustained by the evidence, the second proposition need not be considered.

If deceased was not in the exercise of due care and caution, he was, in the eye of the law, guilty of negligence; and if that negligence contributed to his death, appellee can not recover in this action. Lake Shore & M. S. R. R. Co. v. Hessions, 150 Ill. 546.

· "To entitle plaintiff to recover in this kind of an action he must have been in the exercise of ordinary care, at the time of receiving the injury. He could not be in the exercise of ordinary care and at the same time guilty of negligence that contributed to the accident. The injury must be attributed to the defendant's negligence and to that alone." C. & A. R. R. Co. v. Kelly, 75 Ill. App. 493; Chicago City Ry. Co. v. Fennimore, 78 Ill. App. 479.

It devolved upon appellee to prove by a preponderance of the evidence that at the time of, and immediately preceding the accident, the deceased was in the exercise of ordinary care. C. B. & Q. R. R. Co. v. Gregory, 58 Ill. 272; C., B. & Q. R. R. Co. v. Warner, 108 Ill. 553; North C. St. Ry. Co. v. Louis, 138 Ill. 11; I. C. R. R. Co. v. Nowicki, 148 Ill. 29.

It is said in West Chicago St. R. W. Co. v. Manning, 170 Ill. 427:

"What is ordinary care depends upon the circumstances, of the particular instance. When the circumstances are such that an ordinarily careful and prudent person would deem it essential to exercise a greater degree of care and caution than upon less threatening circumstances, such greater degree of care would be but ordinary care.

One must act under all circumstances as a reasonable, prudent person would act, which is denominated reasonable or ordinary care." C. W. & V. Coal Co. v. Peterson, 39 Ill. App. 118.

Keeping in mind these propositions of law, does the evidence show that the deceased exercised ordinary care? This is not a case where no witnesses saw the accident, and where the circumstances and actions of the deceased are unknown. If it was, proof of his character as a cautious and

prudent man, would be admissible and might warrant the presumption that he acted with due care and caution. But if there were witnesses who saw the accident and who testify to the actions of the deceased at the time, and to the circumstances and environment preceding it, such proof would not be admissible. C., R. I. & P. R. R. Co. v. Clark, 108 Ill. 117; I. C. R. R. Co. v. Ashline, 171 Ill. 313.

It follows then that we must look to the evidence in the case as given by those who saw the accident and are familiar with all the conditions, to see if it affirmatively appears that the deceased was in the exercise of ordinary care.

There is a conflict in the testimony as to whether the bell was ringing, and as to the rate of speed. Witnesses for the appellee estimate the speed at seven or eight miles an hour, while the engineer, fireman, brakeman and conductor say it was from three to four miles, about as fast as a man could walk—slow—so as to couple to a caboose. There was no brakeman on the rear car of the train backed up. The conductor stood on the crossing, acting as flagman. These are circumstances bearing mainly on the question of defendant's negligence, and as the first question to be settled is the question of ordinary care on the part of deceased, they need not be considered unless this question is answered in favor of appellee.

As to the circumstances and conditions of the accident, there is little, if any, conflict of testimony. From the time Captain Batson started to walk east on the sidewalk there was nothing to obstruct his view of the switching train. All that was required to see it was to turn his eyes southward as he walked.

N. O. Walker, a witness for appellee, testifies to this, and also that he was coming west on the sidewalk from the direction of the depot and saw the car "kicked" toward the crossing on the west track. That he ran so as to cross over before it, and proceeding on his way he met Captain Batson going east on Main street. That from where he met him he would have about 150 feet to walk before coming to the platform of the depot.

From this testimony it is apparent that the deceased, facing eastward, could have seen the cars that were then being switched on these tracks.   The train, after "kicking" the car, immediately passed by the switch from the west track, 190 feet below the crossing, to the middle track, and began to back northward toward the crossing.   Captain Batson in the meantime approached the crossing from the west.   Before reaching it he passed a boy who had run by him on the sidewalk, and who was there waiting for the train to go by.   He also passed two young men, brothers, who were standing on the sidewalk between the west track and the middle track, also waiting for the train to pass. The testimony of one of these young men (but one was on the stand) is, that the deceased walked off the sidewalk around them on the north side, and that as he came up to them and was passing around them, Moss, the conductor, standing on the street crossing, called to him to "look out," and was waving his hands.   He also testified that Moss had warned him and his brother to stop.

Hazen Hubbs testifies that he started west from the depot and was warned by Moss to stop, and that he did stop between the main track and the middle track; that he saw Batson approaching and heard Moss call to him to stop. Other witnesses for appellant, including Moss, testify that Moss called to Batson in a loud voice to "look out."   Witnesses for appellee who were on the west side of the square, 200 feet from the crossing, also testify to hearing outcries, either of Moss or of Batson, or of both, and that as soon as they heard them they turned and saw the deceased either in the act of being struck, or stumbling and falling after being struck.

Dr. Lightfoot, for appellee, testifies that he was on the east side of the main track, near the express office, thirty, forty or fifty feet east.   That "the hallooing attracted my attention.   The next I saw was the old gentleman under the wheel."   That the caboose of the south-bound freight stopped a little above the passenger depot, and that he went up and around the end of the caboose to him.

N. O. Walker, before mentioned, for appellee, testifies that after meeting Captain Batson he had reached West street, the street west of the square, and had proceeded south on West street to Clements & Co.'s grocery store, when he heard the hallooing.

Lafayette Rendleman, for appellee, testifies that he was about 200 feet away looking westward, when his attention was attracted by unusual hallooing; that he turned and looked and saw the body moving like it was being shoved. He made several steps before he fell.

Moss, the conductor, testifies that he first saw Batson about the corner of the park; that before this he began to halloo to a couple of young men who were ahead of him; that he hallooed at them and stopped them. In this he is corroborated by Scaggs, one of the young men who testified. Moss further testifies that "seeing the old gentleman was not going to stop, I hallooed to him to halt. He did not seem to pay any attention when I began to halloo. He stepped right around these two young men, and right between the rails on the pass track, opposite the draw-bar. He walked sideways four or five steps and fell. I continued hallooing at him from the time I saw him approaching until the time he got killed. There was an old gentleman behind him and he was hallooing at him or at these two young men. I did not realize that he was going to step on the track until the moment he did. If I had I would have run to him and stopped him. The young men stopped and I thought he was going to stop. It was all of twenty feet from the place I first hallooed at him to where he was struck. He finally looked up to me just before he was struck by the cars. I was waving my hands at him to halt."

Renfro, for appellant, testifies that he was walking on the sidewalk eastward, following Captain Batson. That he saw the conductor waving him to stop. That Batson continuing to advance, he, Renfro, hallooed "look out."

There is no testimony that the deceased at any time looked to see if a train was approaching from the south, or that he took any precaution to ascertain if there was danger

from that direction.  Nor does there appear in evidence any reason or excuse for his not doing so.  During this time a long freight train was coming in from the north on the main track.  This is the train above referred to by Dr. Lightfoot.  The only attention given by deceased, that appears in evidence, is, that when Moss called to him to "look out" as he was passing the two young men, on the sidewalk, that he looked up toward Moss and kept moving on.

In addition to this there is uncontradicted evidence that four persons, the boy and the two young men on the west side, and Hazen Hubbs on the east side, either heard the warning of Moss, or saw the train coming, or both, and stopped and waited for its passage.  What notice was there to them that was not given to the deceased?  And was not their conduct simply the exhibition of ordinary care under the circumstances?  Was not also the stopping of the two young men on the sidewalk between the tracks around whom deceased walked, directly toward the coming train, a circumstance that would have arrested the attention of an ordinarily careful man approaching a dangerous railroad crossing, and have caused him to make some effort to ascertain if a train was coming?

We have then undisputed evidence that others walking ahead of the deceased in the same direction, on the same sidewalk, at the same time, heard the warning of the conductor, saw the train and waited for it to pass.  That Hubbs on the east side saw the warning of the conductor, saw the train and stopped.  If deceased had exercised the care of the boy, of the two young men and of Hubbs, he would have escaped his death.  They exercised nothing more than ordinary care under the circumstances.

The evidence of eye witnesses in this case instead of tending to show ordinary care on the part of the deceased, strongly tends to show its absence.  When this is the case no inference of due care and caution, that will sustain an allegation of their exercise, can be drawn from character and careful habits alone.

While it is true that a failure to look if a train is approach-

ing is not in itself, as a matter of law, such negligence as will prevent a recovery, but is a fact to be considered by the jury in passing upon the question of ordinary care, it is also true that it is the duty of one approaching a place of danger to do so cautiously, and that this duty is the more imperative when the crossing is peculiarly dangerous and the person approaching knows that it is dangerous.

In C. A. Pressed Brick Co. v. Sobkowiak, 38 Ill. App. 531, is said:

"Negligence is the failure to do what, under all the circumstances of the case, a reasonably prudent person would do for his own welfare and safety."

In Pennsylvania Co. v. Frana, 112 Ill. 404, the court says:

"It is no doubt true that it is the duty of a person about to cross a railroad track, to approach cautiously, and endeavor to ascertain if there is present danger in crossing."

Citing this quotation and commenting upon it, in C., St. L. & P. R. R. Co. v. Hutchinson, 120 Ill. 596, the court says:

"It is undoubtedly the duty of a person approaching a place of danger, to do so cautiously and with due and proper care for his safety; and the law requires that he should exercise such care as ordinarily prudent and cautious men would observe under the circumstances surrounding him. But the degree of care can not be formulated as a rule of conduct, for it is evident that the conduct of ordinarily cautious and prudent men would vary as the circumstances presented might be varied."

In C. & N. W. Ry. Co. v. Dunleavy, 129 Ill. 149, it is said:

"The proper rule was laid down with substantial accuracy in the thirteenth instruction given at the instance of defendant, in which it was held, that if the deceased, by the exercise of ordinary care, could have seen the approach of the train, then the law made it his duty to see it, and that if he failed in such duty, his failure would bar a recovery, unless the evidence showed that the defendant or its servants were guilty of negligence so gross as to amount to a willful disregard of the rights or safety of the public."

In the case at bar it is not claimed that the defendant, was guilty of gross negligence of this character.

In C. & E. I. R. R. Co. v. Tilton, 26 Ill. App. 368, the court says:

" We are at a loss to perceive how the court can declare to the jury, as an absolute proposition of law equally applicable in all cases and under all circumstances, that one attempting to cross a railroad track must first stop and listen to see if there is an approaching train. The circumstances that would relieve one from such a prudential and reasonable act may rarely occur, but if it is not always and under all circumstances a duty, then the particular circumstances of each case must determine whether the omission so to do would be negligence or not."

In C. & A. R. R. Co. v. Adler, 129 Ill. 335, it is said :

" We are aware that this and other courts have repeatedly held, when passing upon questions of law as well as of fact, that it was negligence in a person attempting to cross a railroad not to pause and look for approaching trains. But while that may be true as a matter of fact in any particular case, it is manifest that it must at last depend upon the circumstances shown; and the jury must, in the first instance, say, as a matter of fact, whether it was necessary to the exercise of ordinary care."

In C. & N. Ry. Co. v. Dunleavy, cited *supra*, it is said:

" Undoubtedly a failure to look or listen, especially when it appears affirmatively that looking or listening might have enabled the party injured to see the train, and thus avoid being injured, is evidence tending to show negligence. But they are not conclusive evidence, so that a charge of negligence can be predicated upon them as a matter of law. There may be various modifying circumstances excusing the party from looking or listening, and that being the case, a mere failure to look or listen can not, as a legal conclusion, be pronounced negligence *per se.*"

These authorities, and many others that might be cited, warrant the statement that while a failure to look if a train is approaching is not in law negligence *per se*, it is negligence in fact, if there are no conditions or circumstances which excuse looking. And a jury, without evidence of conditions or circumstances which excuse looking, when looking would disclose the danger, is not warranted in finding that such failure to look is not negligence.

While the question of ordinary care was in the first

instance a question of fact for the jury to pass upon, it is now a question to be passed upon by this court. If there was a conflict of testimony upon this issue, and there was evidence if considered alone sufficient to sustain the verdict, the finding of the jury would be conclusive. But if there is no evidence tending to show care and caution, and no excuse or reason shown for their absence, the allegation in / the declaration of due care and caution is not proved. Being a material allegation, not proved, the instruction to find for defendant should have been given. Lake Shore & M. S. R. R. Co. v. O'Conner, 115 Ill. 254; Rack v. Chicago City Ry. Co., 173 Ill. 291. The affirmative allegation of due care and caution not being proved, and willful or wanton negligence not being charged, it is unnecessary to examine the allegations of negligence on the part of appellant.

This being the second time before this court, it is fair to presume that appellee has presented all the testimony available to sustain his side of the case. Judgment reversed.

· The court finds, as ultimate facts, that the deceased was not in the exercise of ordinary care, and that in consequence thereof he was killed; it further finds that there is no evidence tending to prove that the deceased was in the exercise of ordinary care when he met his death.