## Samuel Hyndman, Appellee, v. Chicago Junction Railway Company, Appellant.

### Gen. No. 15,519.

CONTRIBUTORY NEGLIGENCE—*when person seeking to cross railroad tracks guilty of.* Held, as a matter of law, that a person seeking to cross railroad tracks at an intersection where he knew from previous daily experience no flagman was stationed, was guilty of contributory negligence, where it appeared that he made no effort to see the approaching locomotive which struck him and did not listen to any sounds caused thereby, but walked straight on toward the track without looking to the right or left up to the time he was struck; it likewise appearing that if he had taken the precautions which he did not take he could have avoided the injury sustained.

Action in case for personal injuries. Appeal from the Circuit Court of Cook county; the Hon. RICHARD W. CLIFFORD, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1909. Reversed with finding of fact. Opinion filed May 16, 1911.

WINSTON, PAYNE, STRAWN & SHAW, for appellant.

MCGOORTY & POLLOCK, for appellee.

MR. PRESIDING JUSTICE SMITH delivered the opinion of the court.

This action was brought by the appellee to recover for injuries received shortly after six o'clock on the morning of November 5, 1903, as the result of being struck by the tender of one of appellant's locomotives at a point opposite Center Avenue, at the southern boundary of the Union Stock Yards, Chicago.

It appears from the record that the territory known as the Stock Yards is bounded on the south by Forty-seventh street, and on the east and west by public streets in the city of Chicago. Center avenue extends south from Forty-seventh street at a point opposite the middle of the southern boundary of the Yards. At the time of the accident, November 5, 1903, a board fence, from eight to ten feet high, extended along the north line of Forty-seventh street, the entire length of the Stock Yards, broken only by an opening of from twenty-five to thirty feet wide at a point opposite the intersection of Forty-seventh street with Center avenue. There was a flag shanty four feet by five feet and ten feet high at the west end of the opening in line with the center of Center avenue. The board fence came up against the west side of the shanty, the north line of the shanty corresponding with the line of the fence. The opening was to the east of the shanty. North of this opening is a private street of irregular outline called Center avenue, extending north for some distance in the Yards. Two of appellant's switch tracks extended across this opening north of the fence and parallel with it. The southernmost track was four or five feet north of the fence.

About twenty-five feet west of the opening in the fence a cross-over track of about one hundred feet in length led from the southern track or fence track to the track next north of it. Switch tracks extended from both of those tracks off to the northwest where there was an extensive switch yard. The stands controlling the switches were three or four feet east of the crossing in question.

Appellee had been working for various companies in the

Hyndman v. Chicago J. R. Co., 162 Ill. App. 203.

Stock Yards for about twenty years, and during all that time had lived somewhere south of Forty-seventh street. Until the fence was built, which was about five years before the accident, he had been in the habit of crossing the railroad tracks at any point along the south side of the Yards on his way to work. After the fence was built he had gone through the opening shortly after six o'clock in the morning every day to his work and returned across the tracks in the evening. The engines of the Chicago Junction Railway Company, appellant, were constantly operating back and forth over this crossing, switching cars for the various industries in the Stock Yards, with all of which appellee was perfectly familiar.

Shortly after six o'clock on the morning of the accident appellee went north on the east side of Center avenue on his way to work for Armour & Company, where he was employed. He had crossed Forty-seventh street in a northeast diagonal direction and then went north through the opening in the fence, passing four or five feet east of the shanty. He emerged from behind the shanty with his head down, and without looking in either direction, or, as he testified, without thinking about the cars at all, and was about two steps east of the shanty on the southernmost track, when the corner of the locomotive tender backing east struck him in the shoulder, knocking him down. In some way his foot was caught under the wheel of the tender, and his toes were crushed so that amputation of about half of the length of the foot was necessary.

Appellee had used that particular place to enter the Yards ever since the fence was built. During that time he had never seen a flagman there at six o'clock in the morning, and as he testified, never expected to see a flagman there, and did not look for one when he attempted to cross over the tracks. A flagman ordinarily came on duty at seven o'clock in the morning.

His case was submitted to a jury upon the four additional counts of the declaration. The first count averred that the appellant failed to maintain at the said intersection gate a

flagman or other means of warning passersby of the approaching trains.

The negligence averred in the second count was that the defendant carelessly and negligently ran and operated and drove its locomotive engine to and upon the crossing without keeping a reasonably careful lookout. The negligence averred in the third count is that defendant improperly, negligently and carelessly maintained, managed, controlled and operated its railroad and locomotive engine, and the fourth count averred that the appellant failed to have a bright light directed in any way in the direction said locomotive was moving, or other means of warning persons.

Several grounds are urged by appellant for the reversal of the judgment. In our opinion the case turns upon the question whether the appellee was guilty of contributory negligence in going upon the track upon which he was struck and injured. As we said in C. & E. I. R. R. Co. v. Olson, 113 Ill. App. 320: "No inflexible rule can be laid down as to what constitutes contributory negligence on the part of a person who is struck by a railroad train when passing over the track upon which said train is moving. Each case depends upon its own circumstances." In I. C. R. R. Co. v. Batson, 81 Ill. App. 142, after a review of many authorities the court said: "These authorities and many others that might be cited warrant the statement that while a failure to look if a train is approaching is not negligence *per se,* it is negligence in fact, if there are no conditions or circumstances which excuse the looking. And a jury without evidence of conditions or circumstances which excuse looking, when looking would disclose the danger, is not warranted in finding that such failure to look is not negligence."

Appellee's own statement of the accident is in part as follows: "As soon as I got to the south side of Forty-seventh street I walked over in a northeast direction towards the opening in the fence. As I walked over there I was looking north. I was looking straight ahead of me. As I came across the street walking northeast I was looking northeast straight ahead; saw the fence on the north side of Forty-

Hyndman v. Chicago J. R. Co., 162 Ill. App. 203.

seventh street. I was close opposite the fence when I looked at it, three or four feet south of the shanty. I walked along until I got within three or four feet of the fence and then turned and walked to the front of the shanty, east of the shanty. I seen the fence when I was coming across the street; took particular notice of it. I looked at the fence when I was about twelve feet north of the street car tracks and about twelve feet south of the shanty or more.  *  *  * Didn't see anything coming over the top of the fence; saw no sign of an engine cab. The people ahead of me who were going over the crossing were fourteen or fifteen feet away. Seen about five or six; had no difficulty seeing them. Could see people plain. At the time I was on the south side of Forty-seventh street, when I looked west just as I passed the corner of Fitzpatrick's saloon, I could see the fence over there. I could see about one hundred feet west at that time.  *  *  *  As I continued to walk north from that point I was looking right north; I was looking north across the track all the time. I don't remember looking in any other direction but north, from that point south of the shanty until I was hit. I was making a regular march probably between three or four miles an hour. Didn't walk in any other direction or turn in any other direction except to go straight north before the moment I was struck. The first thing I saw of the engine that struck me was the northeast corner. I didn't see it at all before it struck me. At that time I was a step and a half or two steps east of the shanty, that would be from four to five feet, something like that.  *  *  *  I don't know how fast the engine was going. As I was going north there I was thinking about getting down to my place where I had to work I suppose, but I don't know. I don't know what I was thinking about. I was not thinking particularly about cars that might be coming along the crossing. I don't know that I was thinking about them at all. I was in the habit of crossing there about six o'clock every day for about twelve months; had used that particular place to go into the Yards ever since the fence was built. During that time I never saw a flagman there at six o'clock in the

morning. There never was a flagman there at that hour while I crossed over there. I never expected to see a flagman there and never looked for one when I went over there. * * * The engines and car were there most of the time. Every time I went over there there was an engine somewhere near there working back and forth on the tracks continually. You could see them going back and forth off of the street."

The witness James Hawkins testified, that when he saw the appellee that morning appellee was about five feet east of the shanty going north at a regular gait; that he saw appellee struck by the tender, but that he didn't see the tender before appellee was struck by it; that he saw him knocked down and rolled over on the plank crossing, but the witness kept on going, and passed over the crossing without stopping to see how badly appellee was hurt. This he explains by claiming that he had to get to his work. He further testified as to appellee's actions that he was looking north and going north before he was struck; "didn't see him look any other direction at all that I know of; didn't see him turn in any other direction. I think I would have seen him if he had turned either one way or the other." Hawkins further said that the engine appeared to be going ten or twelve miles an hour, but upon cross-examination he admitted that he had never had occasion to estimate the speed of a locomotive, and that it might have been going less than that.

Love, the fireman, and Thompson, the engineer, testified that they were moving about three or four miles an hour.

The witness Nora Liston, who sold papers at this gate or entrance, testified that the engine was going about ten miles an hour. ",It was going slow, like a child walking. I don't think it was going ten miles an hour. I could just walk as fast the engine. It was going slow."

On the question as to whether any warning was given of the approach of the locomotive appellee said that no whistle was blown or bell rung; and Hawkins said that he heard no bell. On the other hand, Love, the fireman, and

Thompson, the engineer, testified that the bell was being rung by an automatic air bell ringer, which did not require the pulling of a bell cord to ring it. And Nora Liston testified that the bell was ringing slow. Daly, the switchman, who at the time of the accident was standing some four hundred feet northwest of the crossing, testified that the bell was ringing when the engine went east from him and that it was an automatic bell.

There is some controversy in the evidence as to the distance between the north side of the flag shanty and the south rail of the track on which appellee was struck, but in our opinion this controversy is of little importance on the question of the contributory negligence of appellee.

In C. M. & St. P. Ry. Co. v. Halsey, 133 Ill. 248, the court, through Mr. Justice Scofield, said: "One who failing to observe due care blindly walks into a danger that the observation of due care would have enabled him to avoid, is no less guilty of contributory negligence than he who being able by the observance of due care, to extricate himself from danger, fails to make any effort for his own personal safety and because thereof is injured. Abend v. Terre Haute R. I. Co., 111 Ill. 203. On approaching a railroad crossing is bound to know that it is a place of danger, and he must give that attention to the sights and sounds warning of an approaching train that a man of ordinary caution under like circumstances would give. If he shall permit himself to become absorbed in thought about other matters, and in consequence, oblivious of his present surroundings, he will do so at his own peril."

In Boyle v. I. C. R. R. Co., 88 Ill. App. 255, this court said: "It appears from appellant's testimony that he was not on the track itself when he was struck by the engine but on the side of the track and approaching it. He appears to have reached the track at the instant when the engine was passing the point of intersection of his course with that of the train. He was hit only upon the head; and not by the front of the engine, according to his own statement, but by its side. In other words, he thrust his head blindly against

a passing engine. It appears there was nothing to obstruct the view of the approaching train except the watchman's tower from behind which he emerged a few seconds before he struck the engine. The tower was a small structure which he must have passed in two or three steps, and before reaching it his view of the approaching train going only at the rate of about twelve to fourteen miles an hour, was unobstructed. It is evident that appellant did not take the precaution to look. * * * But that he did fail to use ordinary care for his own safety seems to admit of no question."

It is clear, we think, from the testimony of appellee and the other witnesses in the case who were in the position to observe appellee's actions, that he made no effort of any kind to see the approaching locomotive, nor did he listen to any sounds caused by the locomotive, but walked straight on toward the track without looking to the right or left up to the time he was struck, by the locomotive tender. It is clear from the situation of the tracks and the fence and the switch shanty that appellee, by the exercise of due care and caution for his own safety, might have seen the approaching locomotive had he glanced to the west at the time that his line of vision would be clear of the shanty and before coming upon the railroad track. It is susceptible of mathematical calculation we think, and it is evident without any mathematical calculation, that he could have seen the locomotive approaching when it was some distance to the west if he had looked as soon as he arrived at a point where his vision would be unobstructed by the corner of the switch shanty. But this precaution appellee did not take, although he had been for years familiar with the constant use at all times of this track for irregular switching purposes; and he very well knew that locomotives and trains were passing over these tracks at the point where he was injured at all hours of the day, and that he might expect to meet a locomotive or train whenever he entered the gate and was about to step upon the track. According to his own testimony he was not relying upon any warning of any kind, for the reason that he knew that no flagman was ever on duty at the hour when he was

attempting to cross the track. We think from the evidence that the locomotive was moving at a slow rate of speed and that the automatic bell was ringing. It seems to us, and we are of the opinion, that appellee was clearly and palpably negligent in thus attempting to pass over the track of the appellant railway, in the manner in which he did, and without looking to the right or left to ascertain whether there was any locomotive or train approaching.

Many similar cases might be referred to in which it was held that the plaintiff failed to exercise due care under facts and circumstances similar to those shown in this record. We are compelled to hold upon the evidence of the appellee and all the witnesses that saw the accident that the appellee, at and immediately before the time of the injury, was guilty of contributory negligence without which he would not have been injured, and therefore he cannot recover in this case.

In view of our holding on this question it is unnecessary for us to consider and determine the other questions presented.

The judgment is reversed with finding of facts.

*Reversed with finding of facts.*